1936-14 Western Missouri United States v. Anthony Whitehead Court will hear from Mr. Haley May it please the Court, Your Honor. This is a case on appeal for Mr. Whitehead regarding both a motion to suppress, in which case he was charged with possession of a weapon as a felon in possession and cocaine. And then the jury trial that followed as well and the finding of guilt. I also want to note that Mr. Kopp did inform me beforehand that in regard to the jury instruction case or the jury instruction claim that pursuant to case number 966F3rd 700, I guess that that has already been determinative. So I will waive that issue at this time and move on to the other issues. And thank you, Mr. Kopp, for telling me that because I didn't want to look like such a fool in front of the court, not realizing that it had already been ruled on. The first issue I would like to take up is the protective sweep question. This kind of goes to the heart of why the search of the hotel room was necessary without a warrant, in which case the officers could have gone and sought a warrant. Shortly thereafter, when they entered or they knocked at the room, Ms. Lark, Mr. Whitehead's wife, entered the room unclothed. And I think almost to the day it was a day like today, except for there was no snow falling on the ground. But it was very cold. It was in January. And she was pulled out of the room naked. They were asked they asked her who else was in the room. And she said, Anthony, referring to Anthony Whitehead. And the officers asked him to step out of the room. They could see a figure in the back. And he stood up and came around the bed and walked out the door stark naked, was laid across the door, the threshold parallel to it, his head past the door frame and his feet past the other door frame, with several officers standing over him. Now, Deputy Flanagan of the ATF stated that he that there was I'm sorry, shortly thereafter, one of the other deputy Volk, he testified, in fact, that he went back to the bathroom and checked back there. This is a very small hotel room with just the bathroom. He checked the bathroom first, but noticed as he was coming in this bed with this frame and it's got this giant box underneath it rather than just a standard bed frame and box frame and was concerned about that and that that might have a person inside of it and then elected to lift up the mattress. Now, I would note that if he was concerned about this box, this frame, this cabin having a cavity in it and that there was somebody there, it's surprising to me that he would not have at least asked for backup there to come into the room when they were going to lift this mattress up initially. And by lifting the mattress up all the way, the gun was clear up at the front right hand corner of the mattress. You were concerned about somebody being inside of that cavity. I would assume that you'd want several other of your law enforcement officers, fellow law enforcement officers with you there when you gently lifted up the the foot of the mattress. There was a great deal of testimony and focus paid upon this cavity. And yet and yet. And it's clear in my brief and by the record in the transcript of the of the suppression hearing that once they lifted that up, there was a small thin cotton kind of a pad. And that is to keep the mattress, the top mattress from sliding on the plywood. They didn't even bother lifting that up if they were so concerned that this cavity contained somebody. And again, that's where all the attention was. They never looked in the cavity. I inquired about that and there was no explanation why this cavity, which inside of this box was such a big deal when they entered the room and then it's gone. Any concerned about it? What's even more salient here, and I don't think that this was noted in my brief, is the fact that the gun was left at the front of that underneath the mattress at the front. If they were so concerned that somebody was in that cavity, why did they leave the gun there initially before they came back in? So what's the significance of all this is the significance that this is ineffective, protective sweep, that the officers had some other motive for what they were doing. I'm just trying to figure I understand the factual arguments you're making. I'm just trying to figure out where they lead us. Yes, that's what I argued, Your Honor. In fact, that I think it was pretextual, the whole thing regarding the cavity in the search there of the bed. Again, if they pay so much lip service to it while they're testifying and even in the police reports. I mean, it's just the record is replete with all of this, these concerns about this cavity and yet nothing. Once they got outside at that point in time, and I think I hope that's answered your question, but yes, I you know, and maybe this reflects my own ignorance of protective sweeps to some extent. But does it deviate from the general rule that we don't care about the subjective intentions of the officers, which is to say that if there was an objective, reasonably reasonableness in terms of doing the productive sweep, why do we care whether it was pretextual? And I have to concede that to you, Judge, you're absolutely correct. I'm not going to make that argument as far as the objective. The objective search was correct. They went into the bathroom, they came through the room, you know, concerned about, you know, this cavity. I just want to point that out for the court. As far as the as far as the consent goes, and I know that the case law cuts both ways in the Eighth Circuit, the initial decision in the Williams case that cited to the U.S. Supreme Court case in Jeffers said that even though the room was registered in her name that he does vicarious or they would state that that's not doesn't preclude him from having a reasonable expectation of privacy. Now, I will concede, in fact, that the later case of the Benguano that was also decided by the Eighth Circuit in 2015 does say that Fourth Amendment rights are personal rights that may not be asserted vicariously. So that case does cut against against my, you know, my client's claim that his right to privacy was violated, in fact, as far as the consent that was given by Miss Lark, I would note and this is kind of to me was the whole key. And this is what my argument was in particular in regard to this. When they had her in that ATF in the back of that vehicle for the ATF agents did and she was in there for I think I believe was approximately 30 minutes close to it, if I'm not correct. Don't hold me to that. But I know it's quite a long time while they were talking to her. And that recording was provided for everyone to listen to. If you'll note that they kept telling Miss Lark that they were only that they found a gun and that they were only interested in the gun and that they were not targeting her for the gun. What they failed to tell her was that cocaine was also found in the room. So by the time she actually consented to the search of the room, both orally and then eventually in writing, which was probably 20 minutes into this thing with all of the discussion about this gun. We just want the gun. We just want the gun. No discussion of the cocaine. And that placed her in peril. She didn't know about that and they didn't bother telling her about that. And I think that's I think that's very relevant in regard to whether or not this search was consensual. But no express promise was made to her, right? Council. That is correct, Your Honor. I will see. See that. Right. Proceed. What little time I have left. I'm going to if there's no more questions, I'm going to go ahead and defer to Mr. Cobb. Let me ask one more question, which is once they found the gun. This is sort of strange. The protective sweep. They put them they put it back and then they left and they got the consent as you as you suggested. Did they need her consent or did the protective sweep itself have to be removed? And once they saw the evidence in plain view, provide a means for them to just go out and go back and get it without needing another exception. You got me on that one. I was wondering, I mean, I know I did brief it and I see cases both ways. So that's why you know, that's why I'm asking the question. It's a tough question. That's an interesting question. And I must confess, I hadn't thought about that. And it may very, very well obviate the need for the for the warrant at that point or the consent at that point in time. So I'm not going to I can't argue that I could argue it both ways, but I will concede that's a that's a good question. Mr. Haley, what about the alternative theory of a search incident to arrest under the Padroma case? Yeah, that's that's that's always. I would concede that as well, that could that's that's an argument that can be made in this case. Again, I wanted to focus more on the law enforcement's, you know, statements regarding they knew they were going to find a gun and the cavity issue. Very well, we've used up your time, but I'll give you a minute in rebuttal. I may not need it. You're welcome to waive it then. Thank you, Mr. Coffey. May it please the court. My name is Phil Coffey and I am representing the United States in this case. Yes, I did inform Mr. Haley with respect to the instruction issue. That's Judge Kaye's preference for giving the old reasonable doubt instruction instead of the newer version that was decided in the Lamont Owens case. And I will submit a 28 day letter for the court's consideration. It's mentioned in our brief, but it hadn't been decided yet by the time we filed our brief. The other bit of housekeeping that I wanted to do, and it hasn't come up yet, but I will also put this in my letter. But the defendant was arrested later also with cocaine. And in my brief, for some strange reason, I give the same date, January 20, 2017. And in looking at it, it popped out to me it was June 27, wasn't the same day. It was about five months later that he was arrested again in a parking lot with cocaine. That's just a that's just a misprint in my brief. Let me talk about the two issues which I think are the most important here. We have raised the question of whether there is a reasonable expectation of privacy. The magistrate in his report recommendation laid it all out and then didn't actually come to a conclusion, said it was it was doubtful. Defendant had the burden of proof. We don't know much about the case other than the fact that and again, this is something I was looking for this in my brief. There were two actually three warrants out for Mr. Whitehead's arrest and one of them or both of them involved the kidnapping of Brittany Lark. So the the other thing that I that that occurred and if you look at the magistrate's report recommendation, they talked about it is that Mr. Whitehead was a suspect in a police shooting or shooting at a police officer. Fortunately, he wasn't hit. So, yes, they knew he was armed and dangerous. And so when they knock on the door and and Miss Lark enters or answers without any clothing on, there was testimony that they could see somebody in the background, but they didn't know if it was one or two people. It was a fairly small hotel room. It was the time of day. It was like three o'clock in the afternoon or so. It was light outside, but all the blinds were drawn. So they really couldn't see what was going on. And so the testimony was, yes, they asked her, is Anthony here? She said, yes, he comes out. He is handcuffed and placed down at the threshold. Now, we have argued in our brief, as we did in our response to his motion to suppress that under the incident to arrest exception, you really have two things. Number one, you have the question of was he in a position to actually reach for the gun? The argument counter to our argument is that, well, there was one officer there. He was going to his knees. He was in handcuffs. It's going to be very difficult for him to get the gun. But the case law has indicated that that's not necessarily a risk that the police have to take. And especially since we're talking about a very small hotel room and we're talking about a bed that he easily could have lunged for, he could have gotten the gun. I think it would have been difficult, but certainly not outside the realm of possibility. I think certainly, though, the stronger of the two arguments from the government standpoint is the protective sweep rationale. And under Bowie, you have really two things. Number one is you don't need reasonable suspicion if it's if it's relatively close. And the bed obviously was really very close. And we are talking about an objective standard. I mean, I think it at the suppression hearing, Mr. Haley, as he as he did today, is arguing not that they didn't have the right to do it because there was certainly space for someone to hide in there. And again, the officers weren't sure whether we were looking at one or two individuals. His theory is that they were looking for a gun because they really didn't do that thorough search. And that was pretty much the point he was trying to make. And I have two two responses to that, which is, number one, it was pretty clear to me from the testimony. And you could read the record and decide for yourself that they were able to see enough that satisfied themselves that there wasn't anybody else in there. Can I ask you, this this is, you know, Judge Carter asked about the search incident to arrest. You talked about the protective sweep and you mentioned that you don't necessarily need a reasonable, reasonable or articulable fact facts when it's close by. But we've used words like immediately adjoining. And the question I have for you is when he's outside the threshold of the room, is that immediately adjoining or do they in fact, does that exception not apply? And there needs to be some articulable facts justifying the protective sweep. OK, I two answers. Number one, he's at the threshold. I mean, he's right at the doorway. They had to walk over him to get in. And we're talking about a very small room. So I think he is under the case law close enough. The second thing is, is that the magistrate found and we have argued that even if you need articulable facts, we have them. Given the fact that I mentioned the shooting, they had every reason to believe that he was armed. They weren't clear. It wasn't clear if there was another person in the room. I mean, you know, on the one hand, you could say you've got two naked people. We kind of figure out, you know, what they might have been doing. But at the same time, it's not uncommon for three people to be involved or I mean, they really didn't have any way of knowing. And they're arresting these two individuals right outside the room. That could be a very scary situation if there is a third person in there. So to answer your question, I think they were under buoy close enough. And secondly, I think even if we need articulable facts, I think we have them. So I think we have I think we have both here. As far as the the the search is concerned, I'm sorry, the consent is concerned. We also have that. And to answer your question, Judge, I think they were justified in seizing the weapon under the case law that I've read. And we've already made that argument that once they see the gun and part of the reason is, you know, for their own protection, the idea of leaving it there probably wasn't a smart thing to have done. But I think what it shows, I think what it shows is they're trying to follow the law. You know, it's I sit here arguing cases where the argument is, you know, that the police have not followed the defendant's rights. They violated the rights. But there are instances such as here where you see cases where, wow, you took a chance here. You know, the argument that I had about him getting the gun, we have to do individuals to leave the gun there doesn't sound like a very smart thing for me to do. But but again, I think they were doing that to try to make sure they were going by the book. And that gets to the other question of consent, which is just I want to I want to go back to 2007, I think, where they went back and got something illegal. We have other cases that suggest you need to get you need to when you leave the evidence there, even though it's in plain view, there needs to be some other exception that applies that allows you to go back because you have to have the ability to enter. You have there has to be a right to entry. And so what do you think is the correct approach in these circumstances? Should we go to consent or should we just say they could go back in the in the room and and take the gun? I think here we have consent. I mean, I so I don't know that I need to answer that. And and the argument here was and I want to make this clear, the argument was not that that the consent was the fruit of the poisonous tree. The argument was that the consent was was not informed consent. And the whole theory is, is that they somehow misled her, which, of course, is simply untrue. They told her from the get go and they told her repeatedly, you're not you're not a suspect here. Mr. Haley says, well, but there was that that those that cocaine in the pocket of the pants. Well, there was never any thought on our part that that was her responsibility. They're in her pants. We had no evidence that she knew it was there. So we weren't trying to trick her. She's never charged with that. They told her correctly, you are not the focus. The focus is the gun. And at one point she said, well, you know, I'm I'm clear because you're not going to find my fingerprints or DNA on the gun. And of course, they didn't. They found his. So in this situation, I think we have extremely valid consent. She was in custody, but she was informed both by Orly and by that form that she signed that she had the right to withhold consent, which the case law says that's one factor when you're looking at attenuation. I mean, looking at time, which we had here, you're looking at purpose and flagrancy and you really didn't have any flagrancy in my view at all on the part of the officers. And again, they they didn't mislead her. Mr. Haley said they did, but they they were absolutely straight with her and told her you're not the focus. And then she gave consent. So I think we have that here, even if we needed it to get back into the room. I have eight seconds left. So unless there's a question. Thank you very much, your honor. Thank you, Mr. Coffey. Mr. Haley, would you like your minute? I just yes, I would, Judge. Just two things. Just just a matter of point. Mr. Whitehead is laid across the parallel to the threshold. As I said, he's got several heavily armed law enforcement officers standing over him. The bed. Look at the photograph of the room. Just the closest corner of the bed is easily five or six feet from the entrance of the door. And that's the closest corner, the corner where the gun was found and where Mr. Whitehead was first observed was on the far corner, front corner of the bed, which would have easily been, I don't know, maybe 10 feet or more away from where he was at with all these law enforcement officers standing over him. My second point about Miss Lark is this. The cocaine was found in his pants. They didn't say the cocaine. They didn't say anything about where the cocaine was found. They didn't even tell her about the cocaine. And I think that was my point. That's all your honor. Well, thank you, Mr. Haley. The court appreciates your willingness to accept the Criminal Justice Act appointment and appreciates the argument of both counsel cases submitted and will be.